IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PA REALTY ABSTRACT CO. OF SPRINGFIELD,<br>            Plaintiff,<br><br>       v.<br><br>SEVENSON ENVIRONMENTAL SERVICES, INC.,<br>            Defendant. | CIVIL ACTION<br><br><br>NO.  12-4171 |

MEMORANDUM

DuBois, J.                                                                                                          July 10, 2014

## I.     INTRODUCTION

This is a contract dispute in which plaintiff, PA Realty Abstract Co. of Springfield ("PA Realty"), alleges that defendant, Sevenson Environmental Services, Inc. ("Sevenson"), breached a contract between Sevenson and a third party, Creative Waste Management, Inc. ("Creative"), which assigned to PA Realty the right to enforce that agreement.  The parties have filed cross-motions for summary judgment.  For the reasons that follow, the Court denies Sevenson's Motion and grants in part and denies in part PA Realty's Motion.

## II.    BACKGROUND

Creative is a dredging and dewatering company of which Alex Petroski is the sole shareholder.  Pl.'s Statement of Material Facts ("Pl.'s SOMF") ¶ 4; Def.'s Statement of Add'l Material Facts ("Def.'s SOMF") ¶ 46.  On or before September 10, 2008, John Gaborek, a Design Project Manager employed by the Denver Board of Water Commissioners ("Denver Water"), contacted Alex Petroski to determine if Creative was interested in submitting a proposal for a sediment removal project at the Strontia Springs Reservoir ("Strontia Springs").  *Id.* ¶¶ 43,

1

45. Denver Water operates the water-works system for the City and County of Denver, Colorado, including Strontia Springs.  *Id.* ¶¶ 29-30, 30-31.

Petroski told Gaborek that Creative did not have the bonding capacity to perform the project.  *Id.* ¶ 49.  Gaborek then gave Petroski the names of the other contractors which had expressed interest in the project.  *Id.* ¶ 48.  In response, Petroski stated that none of those contractors would be qualified to perform the dredging work unless they engaged subcontractors, a situation which Gaborek said Denver Water wanted to avoid.  *Id.* ¶¶ 48-49, 51.  Petroski told Gaborek that he knew of another contractor that would not have to use subcontractors and would refer that contractor to Denver Water.  *Id.* ¶ 49.  However, before doing so, Petroski said he wanted that contractor to sign a commission agreement with Creative.  Deposition of Alex Petroski, Nov. 11, 2013, at 46:16-21.

The contractor which Alex Petroski intended to refer to Denver Water was Sevenson.  Def.'s SOMF ¶ 49.  Accordingly, on September 10, 2008, Petroski contacted Michael A. Elia, president of Sevenson, and told him about an unidentified $30 million project.  *Id.* ¶ 52.  Petroski "intimated to Mr. Elia that only through [him] would Sevenson learn of the existence of the Project."  *Id.* ¶ 53.  In response, Mr. Elia stated Sevenson would sign an agreement to pay a commission to Creative once the identity of the project was disclosed.  *Id.* ¶ 55.  Creative's attorney then prepared two documents: a "Non-Disclosure Agreement," dated September 10, 2008, and a "Commission Agreement," dated September 11, 2008.  *Id.* ¶ 57.  Petroski told Elia that, after both agreements were signed, Petroski would identify the project on the Commission Agreement.  *Id.*  On September 12, 2008, the parties executed the two agreements, and Petroski wrote the name of the Strontia Springs project on the bottom of the Commission Agreement.  *Id.*

2

¶¶ 59, 61.  Four days later, Petroski provided Gaborek with Sevenson's name and Elia's name and contact information.  *Id.* ¶ 62.

> The Commission Agreement states, in relevant part, that:
>
> [Sevenson] agrees [it has] no knowledge of the referenced project and agree[s] to pay [Creative] the following commission based on the following conditions. . . .
>
>> 1. Immediately subsequent to the signing of this agreement, [Creative] will enter at the bottom hereof, the name and address of the specific Project which [Sevenson] is presently not on the bidders list or has presently not gotten any material to compile a qualification package.
>>
>> 2.  In the event that [Sevenson] is the successful bidder on this project, [Sevenson] shall pay to [Creative] a commission based upon five percent of the gross proceeds from the job.

Pl.'s Ex. 1, Commission Agreement (ECF No. 26).

> The Non-Disclosure Agreement states, in relevant part:
>
> One party . . . will provide to the other . . . certain confidential and/or proprietary information for the limited purpose of evaluating and possibly entering into a business relationship or evaluating and possibly working on certain research, engineering or other related projects (the "Opportunity"). . . . The parties acknowledge and agree that Confidential Information does not include information that was, is or becomes (a) part of the public domain without breach of this Agreement . . . .

Pl.'s Ex. 1, Non-Disclosure Agreement.

Although the Strontia Springs project was deferred for some time due to an economic downturn, Def.'s SOMF ¶ 70-71, Denver Water ultimately awarded Sevenson the $30,046,500 project on April 14, 2010.  *Id.* ¶ 81.  However, "differing subsurface conditions" increased Sevenson's costs, and, on November 11, 2011, Denver Water directed Sevenson to stop dredging after just 36.5% of the dredging had been completed.  *Id.* ¶ 86.  Denver Water paid Sevenson $17,082,176.47 for the work it had completed.  Thereafter, Denver Water and Sevenson agreed

to an amendment to their contract whereby dredging operations were suspended and the parties' contractual claims were reserved.  *Id.* ¶¶ 86-89; Def.'s Mem. 36; Pl.'s Mem. 3.

Pursuant to the procedures in the parties' contract, Sevenson submitted a claim to Denver Water's Director of Engineering, seeking compensation for the costs incurred by the "differing subsurface conditions."  Def.'s SOMF ¶ 90.  Denver Water's Director of Engineering denied that claim and Sevenson appealed the decision, pursuant to the procedures in the parties' contract, to a Hearing Officer.  *Id.* ¶¶ 90-95.  In that proceeding, Denver Water submitted several counterclaims against Sevenson.  *Id.* ¶ 93.  On October 13, 2013, the Hearing Officer denied Sevenson's claims but awarded Denver Water $194,050 for the value of the water wasted by Sevenson through inefficient dredging operations.  Def.'s SOMF ¶ 95.

Prior to signing the Commission Agreement, Alex Petroski had executed a Promissory Note in the principal amount of $350,000 on behalf of Creative, payable to PA Realty.  *Id.* ¶ 67. After signing the Commission Agreement, and in order to secure the promissory note, Creative executed a document entitled "Collateral Assignment," dated October 1, 2008, which granted PA Realty a perfected security interest in the Commission Agreement.  *Id.* ¶ 68.  The Collateral Assignment also gave PA Realty the right to "prosecute any legal proceedings in [PA Realty's] own name to recover" payment under the Commission Agreement.  Pl.'s Ex. C, Collateral Assignment (ECF No. 1).

Pursuant to the Collateral Assignment, on July 23, 2012, PA Realty filed suit in this Court, alleging breach of contract against Sevenson for failing to pay the commission due under the Commission Agreement.  On August 31, 2012, Sevenson filed a Motion to Dismiss the Complaint, alleging that PA Realty had failed to allege Creative's default on the underlying promissory note or, alternatively, that Creative was a necessary party to this suit.  This Court

granted that Motion by Order dated October 9, 2012,[1] and on October 12, 2012, PA Realty filed an Amended Complaint. On November 26, 2012, Sevenson filed its Answer to the Amended Complaint, alleging several Affirmative Defenses. Def.'s Answer to Pl.'s Am. Compl. (ECF No. 16). PA Realty and Sevenson filed the instant cross-motions for summary judgment on November 15, 2013 and December 23, 2013, respectively.

---

[1] On April 15, 2014, the Court held oral argument on the pending cross-motions for summary judgment. As a result of that oral argument, and after further consideration of the issues presented in the pending motions, the Court notified the parties that it was reconsidering its Order granting the Motion to Dismiss dated October 9, 2012. Specifically, the Court stated that it was reconsidering its conclusion that "if Creative defaulted on its obligations under the promissory note, [PA Realty] would be entitled to recover from [Sevenson] all monies owed under the Commission Agreement, and would not be limited to the amount of the promissory note." Order, October 9, 2012, at 5 (ECF No. 9). At the oral argument on April 15, 2014, the Court stated, and plaintiff's counsel agreed, that the Commission Agreement gave PA Realty a security interest in the Commission Agreement, and, accordingly, PA Realty would only be entitled to the amount owing on the promissory note in the event of a default.

Thereafter, the Court held telephone conferences with the parties on June 6, 2014 and June 25, 2014. In those conferences, the Court explained that it was reconsidering its ruling that the note must be in default for PA Realty "to exercise its collaterally held rights under the Commission Agreement." Order, October 9, 2012, at 3 (ECF No. 9). The Court stated that pursuant to the Collateral Assignment, PA Realty is entitled, irrespective of a default by Creative, to prosecute the alleged breach of the Commission Agreement on behalf of Creative. *See* Pl.'s Ex. C, Collateral Assignment (ECF No. 1) (giving PA Realty the right to "prosecute any legal proceedings in [PA Realty's] own name to recover" payment under the Commission Agreement"); 13 Pa. Cons. Stat. Ann. § 9607 ("If so agreed, and in any event after default, a secured party . . . (3) may enforce the obligations of an account debtor or other person obligated on collateral . . . ."). Defense counsel agreed that PA Realty was acting as Creative's agent in prosecuting this suit.

The Court told the parties it would memorialize the two above-mentioned rulings in its memorandum on the pending summary judgment motions. Accordingly, the Court concludes, for the reasons stated at oral argument on April 15, 2014, and in the telephone conferences of June 6 and June 25, 2014, that the Collateral Assignment gives PA Realty: (1) the right to recover, in the event it prevails in the instant litigation, only that amount owing on the promissory note in the event of a default, and (2) the right to prosecute this case on behalf of Creative, regardless of Creative's default on the promissory note. In the event PA Realty prevails in this litigation, the Court will enter judgment in favor of PA Realty and Creative, jointly.

### III. LEGAL STANDARD

In considering motions for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). After examining the evidence of record, a court should grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law" and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

### IV. DISCUSSION

Both parties have filed motions for summary judgment. The Court first addresses the arguments in Sevenson's Motion.

#### A. Sevenson's Motion for Summary Judgment

Sevenson, in its Motion, does not argue that it has fulfilled the requirements of the Commission Agreement. Rather, it argues that the Commission Agreement is not enforceable

6

for four reasons, all of which were included as Affirmative Defenses in its Answer: (1) the Commission Agreement violates the public policy of Colorado; (2) Creative failed to provide consideration in exchange for the Commission Agreement; (3) Creative misrepresented that the identity of the Strontia Springs project was confidential; and (4) the Commission Agreement was based upon a mutual mistake of fact.[2] Finally, Sevenson advances two arguments as to the amount due under the Commission Agreement in the event the Court concludes that the Agreement is enforceable. The Court addresses each of Sevenson's argument in turn.

### 1. Public Policy of Colorado

Sevenson first argues the Commission Agreement is void because it violates Colorado public policy. With respect to this issue, Sevenson argues the Court should apply to Colorado law. PA Realty argues the Court should apply Pennsylvania law.[3]

The Court concludes that the public policy of Colorado must be determined based on Colorado law. However, whether or not the conduct in this case violates Colorado public policy will be determined under Pennsylvania law, which the Court notes is the same as the law of Colorado on this issue. *Compare In re Vill. Homes of Colo., Inc.*, 405 B.R. 479, 483 (Bankr. D. Colo. 2009) ("A court is not warranted in voiding a contract unless it is 'fully and solemnly convinced' that an existing public policy is clearly revealed in the laws of the jurisdiction."

---

[2] Sevenson also argues that PA Realty cannot recover because (1) Creative could not assign the Commission Agreement to PA Realty; (2) PA Realty did not give value to Creative for the assignment; and (3) PA Realty failed to show that the underlying debt has not been satisfied. All three arguments attack PA Realty's standing to sue on behalf of Creative. Accordingly, all three arguments are mooted by the Court's conclusion, described *infra* note 1, that the Collateral Assignment granted PA Realty a security interest in the Commission Agreement and the right to enforce that Agreement on behalf of Creative, *regardless* of whether Creative defaulted on the promissory note.

[3] Parenthetically, the Court notes that the parties agree that Pennsylvania law applies to all other issues.

(citing *Superior Oil Co. v. W. Slope Gas Co.*, 549 F. Supp. 463, 468 (D. Colo. 1982), *aff'd*, 758 F.2d 500 (10th Cir. 1985))), *with Ferguson v. McKiernan*, 940 A.2d 1236, 1248 (Pa. 2007) (noting need for a "manifest, widespread public policy" before determining that a contract is unenforceable).

"It is well-settled that contracts that violate public policy are unenforceable." *Bowman v. Sonoco, Inc.*, 986 A.2d 883, 886 (Pa. Super. Ct. 2009), *aff'd*, 65 A.3d 901 (2013). However, Pennsylvania courts have warned that "public policy is more than a vague goal which may be used to circumvent the plain meaning of the contract," and have accordingly required evidence of a "dominant public policy" evidenced by "long governmental practice or statutory enactments." *Hall v. Amica Mut. Ins. Co.*, 648 A.2d 755, 760 (Pa. 1994).

In this case, Sevenson identifies two sources as evidence of Colorado's public policy. First, it cites to a Colorado statute which states:

> Any person, other than a bona fide employee working solely for a person providing professional services, who offers, agrees, or contracts to solicit or secure for any other person contracts for professional services with a state agency or state institution of higher education and who, in so doing, receives any fee, commission, gift, or other consideration contingent upon or resulting from the making of the contract commits a class 3 felony and shall be punished as provided in section 18–1.3–401, C.R.S.

2014 Colo. Legis. Serv. 378 (West).

Sevenson argues that this statute evidences Colorado's public policy "against paying contingent fees to third parties to secure engineering services on public contracts." Def.'s Br. 24. The Court rejects this argument. The statute does not apply to "public contracts." It applies only to contracts with "a state agency or state institution of higher education." That distinction is germane in this case because, as defendant admits, Denver Water is not "a state agency or state institution of higher education," but rather a political subdivision of Colorado. *Denny Const., Inc. v. City & Cnty. of Denver ex rel. Bd. of Water Comm'rs*, 199 P.3d 742, 744 (Colo. 2009)

8

("The Board is a political subdivision of the State of Colorado . . . ."). Colorado law demonstrates that when the Colorado legislature wishes to include both state agencies and political subdivisions within the ambit of its legislation, it does so in unequivocal terms. *See, e.g.*, Colo. Rev. Stat. Ann. § 1-45-117 (2010) ("No agency, department, board, division, bureau, commission, or council of the state *or any political subdivision of the state* shall make any contribution in campaigns involving the nomination, retention, or election of any person to any public office . . . ." (emphasis added)). Thus, the argument that the Colorado statute evidences a broad public policy that extends to contracts entered into by a political subdivision such as Denver Water is dubious at best. Such a tenuous connection to legislation is far from the type of "dominant public policy" evidenced by "long governmental practice or statutory enactments" that is required to render a valid contract unenforceable. *Hall*, 648 A.2d at 760.

As its second source of public policy, Sevenson cites a regulation promulgated by the Colorado State Board of Licensure for Architects, Professional Engineers and Professional Land Surveyors, which states:

> **Recommendations and Employment.** Licensees or their associates shall not compensate or give anything of substantial value to a person or organization, except for a disclosed sales representative, in order to obtain a recommendation for, or secure or retain employment by a client.

Def.'s Ex. 10, Bylaws and Rules of the State Board of Licensure for Architects, Professional Engineers and Professional Land Surveyors, Rule 3.5.2, effective January 1, 2012.

Just as the Colorado statute is inapplicable to this case, so too is the Board's regulation. The regulation prohibits Colorado licensed engineers or their associates from compensating another person in order to secure employment by a client. As PA Realty correctly notes, Sevenson was not a licensed engineer in Colorado. In response, Sevenson argues that a corporation cannot be licensed as a professional engineer, but rather professional engineers

practice engineering through a corporation when they sign and seal documents.  Colo. Rev. Stat. 12-25-104(c).  However, a professional engineer did not sign the Commission Agreement.  Moreover, there is no evidence of record that the Colorado licensed engineer Sevenson ultimately contracted with on the Strontia Springs project, Mark W. Glynn, was in any way connected to — or even aware of — the Commission Agreement.  Def.'s Ex. 43, at 15.  Thus, this case does not implicate the policy underlying the regulation: prohibiting Colorado licensed engineers from improperly securing employment by a client.

The Court accordingly concludes that Sevenson has failed to demonstrate the type of "manifest, widespread public policy," *Ferguson*, 940 A.2d at 1248, required to invalidate a valid contract, and rejects Sevenson's argument on this issue.

       2. Consideration

Sevenson next argues that the Commission Agreement is not enforceable due to failure of consideration.  "It is axiomatic that consideration is 'an essential element of an enforceable contract.'"  *Pennsy Supply, Inc. v. Am. Ash Recycling Corp. of Pa.*, 895 A.2d 595, 600 (Pa. Super. Ct. 2006) (quoting *Stelmack v. Glen Alden Coal Co.*, 14 A.2d 127, 128 (Pa. 1940)).  "Consideration is defined as a benefit to the party promising, or a loss or detriment to the party to whom the promise is made."  *Hillcrest Found. v. McFeaters,* 2 A.2d 775, 778 (Pa. 1938).  "Failure of consideration occurs where the consideration bargained for does not pass, either in whole or in part, to the promisor."  *Necho Coal Co. v. Denise Coal Co.*, 128 A.2d 771, 772 (Pa. 1957).

Sevenson argues that it agreed to pay Creative a commission in exchange for Creative's agreement to provide Sevenson with confidential information about the project.  Def.'s Br. 29.  Specifically, it argues that the Commission Agreement requires that the identity of the project be

confidential. Because there is no dispute that the existence of the Strontia Springs project was not confidential, Sevenson argues that there was a failure of consideration.

The Court rejects Sevenson's argument. "The paramount goal of contractual interpretation is to ascertain and give effect to the intent of the parties." *PBS Coals, Inc. v. Burnham Coal Co.*, 558 A.2d 562, 564 (Pa. Super. Ct. 1989). However, courts consider "not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009). Accordingly, "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone." *East Crossroads Center, Inc. v. Mellon-Stuart Co.*, 205 A.2d 865, 866 (Pa. 1965).

In this case, contrary to Sevenson's argument, the clear and unequivocal language of the Commission Agreement demonstrates that Sevenson's promise to pay a commission was not in exchange for confidential information about the project. The Commission Agreement specifically addresses what is required with respect to the identity of the project, stating that Creative "will enter at the bottom hereof, the name and address of the specific Project *which [Sevenson] is presently not on the bidders list or has presently not gotten any material to compile a qualification package*." Pl.'s Ex. 1 (emphasis added).[4] It then states that "[i]n the event that [Sevenson] is the successful bidder on this project, [Sevenson] shall pay to [Creative] a commission based upon five percent of the gross proceeds from the job." *Id.* The import of this language is clear: the consideration for Sevenson's promise to pay a five percent commission was the name of a project of which it was not at that time on the bidders list or which it had not

---

[4] The Court notes that Sevenson misleadingly omitted the above-italicized language from a quotation in its Reply brief, stating only that the Commission Agreement required "the name and address of the specific Project." Def.'s Reply Br. 5.

11

gotten any material to compile a qualification package. There is no dispute that Creative fulfilled this requirement when it gave Sevenson the name of the Strontia Springs project. Thus, the Court concludes that there is no failure of consideration in this case.

Sevenson's argument to the contrary ultimately rests on an attempt to read the language of the Non-Disclosure Agreement into the Commission Agreement. "It is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties." *Haywood v. Univ. of Pittsburgh*, 976 F. Supp. 2d 606, 639 (W.D. Pa. 2013) (quoting *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 107 (3d Cir. 1986)). However, in this case, interpreting the language of the contracts together does not alter the clear import of the Commission Agreement. The Non-Disclosure Agreement merely states that Creative would provide "certain confidential and/or proprietary information"; it does not state that the identity of the project would be confidential. In fact, the Non-Disclosure Agreement provides that any matter that "becomes . . . part of the public domain," is not confidential information under the Non-Disclosure Agreement. Pl.'s Ex. 1, Non-Disclosure Agreement ¶ 3. This is a significant provision because the parties agree that the name of the project is in the public domain. Thus, construing the two contracts together does not alter the Court's conclusion as to the unambiguous language in the Commission Agreement. Accordingly, the Court rejects Sevenson's argument on this issue.

        3.  <u>Misrepresentation</u>

Sevenson next argues that the Commission Agreement is voidable because Sevenson was induced to sign it by Creative's fraudulent or material misrepresentation that the identity of the project was confidential. "If a party's manifestation of assent is induced by either a fraudulent *or*

a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." *McCloskey v. Novastar Mortgage*, *Inc.*, No. 05-cv-1162, 2007 WL 2407103, at *6 n.6 (E.D. Pa. Aug. 21, 2007). A misrepresentation is fraudulent if "the maker intends his assertion to induce a party to manifest his intent and the maker[:]" (1) "knows or believes that the assertion is not in accord with the facts," or (2) "does not have the confidence that he states or implies in the truth of the assertion," or (3) "knows that he does not have the basis that he states or implies for the assertion." Restatement (Second) of Contracts § 162 (1981); *see also R & R Capital, LLC v. Merritt*, 632 F. Supp. 2d 462, 479 (E.D. Pa. 2009) (same) (quoting *In re Allegheny Int'l*, *Inc.*, 954 F.2d 167, 178 n.8 (3d Cir. 1992)), *aff'd*, 426 F. App'x 85 (3d Cir. 2011). "A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." *R & R Capital*, 632 F. Supp. 2d at 479 (citation omitted); Restatement (Second) of Contracts § 162.

The Court concludes that the evidence presented raises a genuine issue of material fact as to whether Alex Petroski made a fraudulent or material misrepresentation. Sevenson has provided evidence that Alex Petroski, when trying to convince Sevenson to sign the Commission Agreement for the Strontia Springs project, "intimated to Mr. Elia that only through [him] would Sevenson learn of the existence of the Project." Def.'s SOMF ¶ 53. Petroski did not tell Sevenson that the project was to be constructed for a public agency. Def.'s SOMF ¶ 54. Elia's affidavit also states that he relied on Petroski's statements and the Non-Disclosure Agreement in executing the Commission Agreement. Elia Aff. ¶ 7. The Court concludes that this evidence provides a sufficient basis for a reasonable fact-finder to conclude that Alex Petroski made either a fraudulent or material misrepresentation as to the confidential nature of the project and that his

misrepresentation induced Elia to sign the Commission Agreement. On this issue, given the fact that Elia had no knowledge of the identity of the project to which Petroski was referring — or any way of obtaining that information prior to signing the Commission Agreement — a reasonable fact-finder could conclude that Elia was justified in relying on Petroski's misrepresentation. *See Porreco v. Porreco*, 811 A.2d 566, 571 (Pa. 2002) ("Where the means of obtaining the information in question were not equal, the representations of the person believed to possess superior information may be relied upon."). Accordingly, the Court denies Sevenson's Motion for Summary Judgment on this issue.

### 4. Mutual Mistake of Fact

Sevenson's final argument is that the contract was voidable because both Elia and Petroski were mistaken as to the confidentiality of the Strontia Springs project. "The doctrine of mutual mistake of fact serves as a defense to the formation of a contract and occurs when the parties to the contract have 'an erroneous belief as to a basic assumption of the contract at the time of formation which will have a material effect on the agreed exchange as to either party.'" *Hart v. Arnold*, 884 A.2d 316, 333 (Pa. Super. Ct. 2005) (quoting *Bianchi v. Bianchi,* 859 A.2d 511, 516 n.3 (Pa. Super. Ct. 2004)).

Sevenson's argument is easily rejected. The evidence supports, and plaintiff admits, that Alex Petroski did not believe the project's existence was confidential. *See* Pl.'s Reply 16-17; Pl.'s Ex. 2, Dep. of Alex Petroski, Oct. 7, 2013, at 64:17-20, 74:18-75:1. Thus, there was no mutual mistake of fact and the Court rejects defendant's argument on this issue.

### 5. Amount of Commission

Sevenson raises two final arguments in its Motion, both regarding the amount recoverable under the Commission Agreement in the event Sevenson is liable.

14

First, Sevenson argues that the five-percent commission should be calculated so as to reflect the fact that Sevenson had to pay Denver Water $194,050 as a result of a counterclaim for water wasted due to inefficient dredging operations.  The Court rejects this argument.  The Commission Agreement states that the commission is to be five percent of "the gross proceeds from the job."  Pl.'s Ex. 1.  *Black's Law Dictionary* defines "gross" as, *inter alia*, "[u]ndiminished by deduction; entire <gross profits>."  *Black's Law Dictionary* 818 (10th ed. 2014).  Conversely, "net proceeds" is defined as "[t]he amount received in a transaction minus the costs of the transaction (such as expenses and commissions)."  *Id.* at 1399.  The "gross proceeds" of the job, then, do not include deductions for expenses due to Sevenson's wasting of water.  Accordingly, the Court rejects Sevenson's argument that the commission should be calculated after the cost of its counterclaim is deducted; the "entire" amount Sevenson received is the amount they received in exchange for their services on the Strontia Springs project, and does not include deductions for expenses due to wasted water.

Sevenson's second argument is that PA Realty is not entitled to prejudgment interest should it prevail in this litigation.  Under Pennsylvania law, prejudgment interest may be recovered if "a defendant commits a breach of contract to render a performance the value of which is ascertainable by mathematical calculation from a standard fixed in the contract."  *Cresci Const. Servs., Inc. v. Martin*, 64 A.3d 254, 259 (Pa. Super. Ct. 2013).  "The disputed amount must be either specified in the contract or ascertained from the terms of the contract such that at the time of the breach, the breaching party can proffer a tender."  *Id.* at 265.  "Recovery of prejudgment interest under this standard is a matter of law, not of discretion."  *Id.* at 259.

The Court concludes that PA Realty is entitled to prejudgment interest.  The Commission Agreement states that Sevenson is obligated to pay five percent of the gross proceeds from the

job within ten days of Sevenson's receipt of payment under the job. Thus, ten days after Denver Water paid Sevenson $17,082,176.47 for its services on the Strontia Springs project, the Commission Agreement required five percent of that amount to be paid to Creative. Accordingly, because the disputed amount is ascertainable by the terms of the contract at the time of the breach, PA Realty is entitled to prejudgment interest.

Both of Sevenson arguments to the contrary fail. First, it argues that the Commission Agreement does not identify performance with a fixed or ascertainable monetary value because "[o]n September 12, 2008, when the Non-Disclosure/Commission Agreement was signed . . . Denver Water had not awarded the contract to Sevenson and neither had the amount of the contract been determined." Def.'s Mot. 37. The Court rejects this argument. The disputed amount must be ascertainable "at the time of the breach," not at the time of the contract's formation. *Cresci*, 64 A.3d at 265. It is irrelevant that the value of the performance could not be ascertained on September 12, 2008.

Sevenson's second argument is that the value of its performance was not ascertainable because of ongoing litigation between it and Denver Water, in which Sevenson sought further payments from Denver Water, and Denver Water counterclaimed against Sevenson for the cost to complete the dredging contract. Def.'s SOMF ¶¶ 90-93. The Court also rejects this argument. The Commission Agreement requires payment to be made to Creative "within 10 days of receipt by [Sevenson] from the performance of the Project as payment is received by [Sevenson]." Pl.'s Ex. 1. Thus, regardless of ongoing litigation, Sevenson owed Creative its commission ten days after Sevenson received payments from Denver Water. The possibility of future litigation does not alter the fact that at the time of the breach of the Commission Agreement, the amount due to

Creative was ascertainable. Accordingly, the Court concludes that PA Realty is entitled to prejudgment interest in the event it prevails in this litigation.

### B. PA Realty's Motion for Summary Judgment

PA Realty, in its Motion, makes two general arguments. First, it argues that Sevenson's Affirmative Defenses, set out in Sevenson's Motion for Summary Judgment and discussed at length above, fail as a matter of law. On this point, for the reasons stated above, the Court grants PA Realty's Motion with respect to Sevenson's Affirmative Defenses based on Colorado public policy, failure of consideration, and mutual mistake of fact. The Court denies PA Realty's Motion with respect to defendant's Affirmative Defense that the Commission Agreement is unenforceable by reason of a fraudulent or material misrepresentation made by Alex Petroski.

Second, PA Realty argues that the undisputed facts in this case establish that the Commission Agreement is enforceable as a matter of law. For the reasons stated above, the Court concludes that there is a genuine issue of material fact as to whether the Commission Agreement is unenforceable by reason of a fraudulent or material misrepresentation made by Alex Petroski. Thus, the Court denies PA Realty's Motion for Summary Judgment to the extent it seeks the entry of judgment as a matter of law as to the enforceability of the Commission Agreement.

### V. CONCLUSION

For the foregoing reasons, the Court denies Sevenson's Motion for Summary Judgment and grants in part and denies in part PA Realty's Motion for Summary Judgment. An appropriate order follows.